IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

STEVE TILTON,

        Plaintiff,

vs.                                        CIV 04-993 KBM/LCS

DOÑA ANA COUNTY
DETENTION CENTER, et al.

        Defendants.

## **MEMORANDUM OPINION AND ORDER**

      THIS MATTER is before the Court on Defendants' Motion to Dismiss for Failure to Exhaust Remedies Under the PLRA *(Doc. 20)*. Pursuant to 28 U.S.C. § 636(c) and FED. R. CIV. P. 73(b), the parties have consented to have me serve as the presiding judge and enter final judgment. Having reviewed the motion, the memoranda and exhibits submitted by the parties and the relevant authorities, the Court finds that the motion is well taken and will be granted.

      For almost six months in 2001, Plaintiff Tilton was detained on pending state charges at the Doña Ana County Detention Center ("DACDC"). He alleges that he was denied adequate medical care at the facility which resulted in permanent blindness in his right eye. Apparently on September 5, 2001, Tilton began to experience "floater" vision problems in his right eye. The next day, he filled out a sick call slip and wrote a letter to the medical staff complaining of blurry vision and stating that "I am very concerned that I am going blind." *Doc. 21*, Exh. 1 to Madden Affidavit. Plaintiff asserts that he filled out a second sick call request two days later. It appears that he was not seen by Dr. Duhigg until September 17th. That same day, Tilton was seen by an

eye specialist, Dr. Tenorio and on September 19th he saw another specialist Dr. Villalobos. Tilton's affidavit indicates that Dr. Villalobos advised him that he needed immediate surgery. *See Doc. 34*, Exhibit 1 – Affidavit of Steve Tilton. Although he was then moved to the medical unit at the detention facility, Tilton alleges that he was not again seen by a physician until a follow-up visit to Dr. Villalobos on October 11th. Despite further requests, he was not seen by Dr. Duhigg or any other physician while detained at DACDC. *Id.*

Tilton was released on October 25, 2001 when prosecutors entered a nolle prosequi in the state criminal case. Tilton asserts that the State authorities abandoned its prosecution to avoid incurring the costs of the surgery. In February of the following year, Tilton turned himself in to the New Hampshire authorities and was incarcerated at New Hampshire Men's Prison until his release on July 22, 2003. During that period of incarceration, a vitrectomy was performed on September 12, 2002 by Dr. Walsh of the Concord Eye Clinic. On May 14, 2004, he was rearrested in New Hampshire and again released from custody in January 2005. *Id.*

This action was filed on September 3, 2004 while Plaintiff was in New Hampshire's custody, and Plaintiff is represented in this action by counsel Mary Louise Boelcke and Herbert M. Silverberg. Tilton in essence concedes that he never filed a grievance with regard to medical treatment for his eye, and that is the basis for Defendants' motion to dismiss for failure to exhaust administrative remedies. Plaintiff counters that because he was not in custody here in New Mexico when this action was filed, he is a "former" prisoner not subject to the PLRA's exhaustion requirement. In the alternative, Tilton argues that even though DACDC had grievance procedures in place, they were unavailable to him.

Just one year ago, Senior District Judge VanBebber of the District of Kansas faced the

issue of the applicability of the exhaustion requirement to a suit filed by a former inmate. There he noted that

> the Tenth Circuit has yet to consider whether the PLRA's exhaustion requirement applies to the claims of former prisoners. The court's research reveals that the Second and Ninth Circuits, and one judge in this district, have specifically addressed the issue and determined that § 1997e(a)'s exhaustion requirement does not apply to former prisoners. *See Page v. Torrey*, 201 F.3d 1136, 1139 (9th Cir.2000) (stating that "only individuals who, at the time they seek to file their civil actions, are detained as a result of being accused of, convicted of, or sentenced for criminal offenses are 'prisoners" '); *Greig v. Goord*, 169 F.3d 165, 167 (2nd Cir.1999) (holding that "litigants . . . who file prison condition actions after release from confinement are no longer 'prisoners' for purposes of § 1997e(a) and, therefore, need not satisfy the exhaustion requirements of this provision"); *Smith v. Bd. of County Comm'rs of the County of Lyon*, No. 01-4018-SAC, 2002 WL 31928433, at *1 (D. Kan. Nov.5, 2002) (concluding "that the PLRA's exhaustion requirement is inapplicable to suits brought by one who is not incarcerated at the time suit is filed"). . . .

*Canady v. Werholtz*, 2004 WL 1212050, *3 (D. Kan. 2004). In this district, then-Chief Magistrate Judge William Deaton had earlier observed this "direction of the case law." *See Cordova v. Correction Corp. of America, et al.*, CIV 00-982 WWD/RLP, *Doc. 57* at 2-3 (November 7, 2001).[1]

On the other hand, the minority view as set forth in *Morgan v. Maricopa County*, 259 F. Supp. 2d 985 (D. Ariz. 2003) reasons that such holdings "would nullify Congress' intent in passing the PLRA." *Id.* at 992. Indeed, to allow a prisoner to ignore available grievance

---

[1] One other observation: if the Tenth Circuit were to adopt this majority view for an out-of-custody individual who files a lawsuit related to injuries during confinement, Tilton had opportunities to take advantage of that exception to the exhaustion of remedies requirement. He was a former prisoner and free from being held in anyone's custody from October 25, 2001 through February 22, 2002 and from July 22, 2003 through May 14, 2004. *See* Simply put, he did not file a lawsuit while unincarcerated. *See Doc. 34*, Exhibit 1 – Affidavit of Steve Tilton.

procedures and simply wait to file suit until after release, serves none of the goals promoted by the exhaustion requirement: "1) allowing prison officials an opportunity to satisfy the inmate's complaint, thus potentially obviating the need for litigation;  2) filtering out some frivolous claims; and  3) creating an administrative record that facilitates review of cases that are ultimately brought to court."  *Ross v. County of Bernalillo*, 365 F.3d 1181, 1184 (10th Cir. 2004).

    I need not decide which of these views would be adopted by the Tenth Circuit, however, because these arguments fail to address the precise situation in this case.  Tilton **_was_** a prisoner at the time he filed this federal action, albeit in the custody of New Hampshire authorities.  As the Tenth Circuit observed,

> the PLRA prohibits prisoners in **_any_** jail, prison, or other correctional facility' from filing suit under federal law until administrative remedies are exhausted.  42 U.S.C. § 1997e(a) (emphasis added).  The statute defines a "prisoner" as "***any person*** incarcerated or detained in ***any facility*** who is accused of, convicted of, sentenced for, or adjudicated delinquent for, violations of criminal law or the terms and conditions of parole, probation, pretrial release, or diversionary program."  42 U.S.C. § 1997e(h) (emphasis added).

*Id.* (in the context of prisoners in privately operated institutions).  Moreover, when the Second Circuit adopted the minority position and ruled that the exhaustion requirement does not apply to former prisoners, it noted that

> [w]hen introducing the PLRA, Senators Dole and Kyl justified treating prisoners differently from other litigants by stating that prisoners file frivolous lawsuits because filing lawsuits "has become a recreational activity for long-term residents of our prisons," because prisoners "have little to lose and everything to gain," and because filing frivolous complaints is "a means of gaining a short sabbatical in the nearest Federal courthouse." 141 Cong. Rec. S7524-26 (daily ed. May 25, 1995) (statements by Senators Dole and Kyl) (citations and internal quotation marks omitted).  These

4

>justifications simply do not apply to individuals who were formerly incarcerated.

*Greig v. Goord*, 169 F.3d 165, 167 (2nd Cir. 1999). The Eleventh Circuit has determined that Congress intended to set a "bright line" for § 1997e's application to lawsuits filed by individuals then in custody:

>In considering why Congress chose to peg the application of section 1997e(e) on confinement status at the time of filing, it is worth mentioning that confinement status can change several times during the course of the months or years it takes the overburdened district courts to enter judgment in a case. Consider this hypothetical and how episodic the application of section 1997e(e) would be if post-filing confinement status were the criterion: A plaintiff is confined when he files the lawsuit (the section applies); shortly thereafter he is released on parole (the section no longer applies); later he is picked up and jailed on a parole violation charge (the section applies again); he bails out after a few days (the section no longer applies); but after a hearing his parole is revoked, and he is returned to prison (the section applies again). No one has yet explained to us why Congress would have wanted the application of an important provision, such as section 1997e(e), to be such an on-again, off-again thing.

*Harris v. Garner*, 216 F.3d 970, 978-79 (11th Cir. 2000), *cert. denied*, 532 U.S. 1065 (2001).[2]

Thus, it is clear that several of the cited concerns of Congress relate to the fact, not the place, of confinement. I therefore am unpersuaded by Plaintiff's argument that he should be considered a "former" prisoner simply because he was in the custody of New Hampshire rather

---

[2] "In light of the overwhelming clarity of the statutory text, we join the Seventh Circuit in holding that section 1997e(e) applies only to prisoners who are incarcerated at the time they seek relief, and not to former prisoners who seek damages for injuries suffered while they were incarcerated. *See id.; see also, Greig v. Goord*, 169 F.3d 165, 167 (2nd Cir.1999) (interpreting 'prisoner' as used in section 1997e(a), dealing with administrative exhaustion, as not applying to former prisoners no longer incarcerated); *Doe v. Washington County*, 150 F.3d 920, 924 (8th Cir.1998) (interpreting 'prisoner' as used in section 1997e(d), dealing with attorneys' fees, as not applying to former prisoners)." *Harris*, 216 F.3d at 991-92 (Tjoflat, J., concurring in part).

than New Mexico authorities at the time this lawsuit was filed.

In the alternative, Plaintiff contends that even if he was required to exhaust administrative remedies, those procedures were not "available" to him. Defendants have submitted an inmate handbook that includes medical issues within the category of complaints subject to the grievance procedures. *See Doc. 20*, Exh.1 to the Affidavit of Nancy Madden. As Plaintiff points out, however, the copy of the handbook shows that it is a version revised in 2002 after Tilton had been released from DACDC.

Nevertheless, Plaintiff attached as an exhibit a document posted in the housing units that sets forth the procedure and timing for submission and handling of any grievance. *See Doc. 34*, Exh. 5. Those procedures also expressly provide for an emergency processing of a grievance if the inmate so designates the grievance and he can "demonstrate the factors creating a risk that serious harm may result if the normal time limits are followed." *Id.* at ¶5 A-D. Tilton maintains that even if DACDC generally provided a scheme for administratively addressing grievances, that scheme was not made available to him as a practical matter then nor can it be made available now. It does appear that he no longer has the ability to take advantage of the grievance procedure at a New Mexico institution since he is no longer confined by New Mexico authorities.

Tilton relies on *Berry v. Kerik*, 366 F.3d 85 (2nd Cir. 2004). In that case, the court affirmed the dismissal ***with*** prejudice of a state prisoner's complaint against Riker's, a New York City detention facility, for failure to exhaust administrative remedies during several periods of incarceration at that facility. The *Berry* court noted the prisoner's failure to take advantage of available grievance procedures during those periods, totaling nine months, when he was in the custody of the New York City Department of Corrections. *Id.* at 87-88. The Second Circuit

cautioned, however, "We have no occasion to consider the exhaustion requirement in situations where only a brief interval elapses between the episode giving rise to the prisoner's complaint and the prisoner's transfer to the custody of another jurisdiction." *Id.* at 88, n.3.

Plaintiff argues that the seven week interval between September 6th when the injury first occurred until his release from the facility on October 25th distinguish his case from that in *Berry*. Yet in Plaintiff's affidavit, he concedes that he was told by at least September 19, 2001 that he needed "***immediate***" surgery. Thus, he had five weeks during which he could have availed himself of the grievance procedures. There is no dispute that Tilton failed to file ***any*** grievance, emergency or otherwise. Nor is there any allegation or evidence that DACDC staff precluded him from invoking the administrative remedies procedures.

Tilton next contends that the "continuing care doctrine" forgives his failure to exhaust administrative remedies while in the custody of DACDC. " The continuous treatment doctrine tolls the statute of limitations only 'so long as the claimant remains under the continuous treatment' of a physician whose negligence is alleged to have caused the injury." *Espinoza v. U.S.*, 1996 WL 249488, **2 (10th Cir. 1996) (unpublished). Plaintiff maintains that because he was technically under the care of Dr. Duhigg throughout this entire episode, he should be excused from invoking the grievance procedure.

In the context of an FTCA action, District Judge Bruce Black noted that "[t]he Tenth Circuit has said little about the continuous treatment doctrine." *Stephenson ex rel. Stephenson v. U.S.*, 147 F. Supp. 2d 1106, 1110 (D.N.M. 2001). District Judge Black further observed that

> [t]here are not a great number of federal cases discussing the
> doctrine, but there are enough to identify two main lines of cases,
> one which is quite restrictive and one more expansive in applying

7

>the rule.  According to the cases, there are two main reasons for
>applying some version of the continuous treatment rule.  One
>concerns the patient's ability to discover the facts surrounding her
>injury, while she is still being treated by the same doctor who
>caused the injury in the first place. . . .  The second main reason
>given by courts for applying the continuous treatment rule is a more
>pragmatic one -- courts want to prevent interference in the doctor-
>patient relationship, as long as it exists, and want to give the doctor
>an opportunity to treat and heal any injury the doctor may have
>caused.  As the *Ulrich* [*v. Veterans Admin. Hosp.*, 853 F.2d 1078
>(2nd Cir. 1988)] opinion states, some courts feel it is "absurd" to
>require the plaintiff to interrupt corrective treatment in order to
>immediately commence legal proceedings.  These opinions
>emphasize the trust and confidence placed in doctors by their
>patients.  *Id.*  In other words, these courts do not want any
>disruption of the treatment that could end up healing the patient,
>thus avoiding a significant problem later and a lawsuit altogether.

*Id.* at 1109.  I find that neither purpose behind the doctrine would be served by its application here.

First, Plaintiff acknowledges that from his consultation with Dr. Villalobos, he ***knew*** immediate surgery was necessary.  Second, Plaintiff maintains that Dr. Duhigg provided him with ***no*** treatment for his eye condition.  "[I]f discovery by the plaintiff is the main focus of the rule, there is no reason to apply the rule if the plaintiff already knows an injury has occurred and already knows of the cause of the injury."  Moreover, I have located no case law addressing the applicability of the continuous treatment doctrine in the context of 42 U.S.C. § 1997e(a), where the statute requires active diligence in pursuing administrative remedies, even those associated with medical care.  For all of these reasons, I am unpersuaded that the doctrine offers Tilton any relief.

Finally, to the extent that Plaintiff contends that the "unique facts" presented here "impeded" his ability to exhaust remedies, I find them to be without merit.  Plaintiff knew how to

file grievance, and in fact filed *__two__* such grievance against Dr. Duhigg in June 2001 when the physician refused to renew a prescription for medicine.  *See Doc.21,* Exhs. 2 & 3 to Affidavit of Nancy Madden.  He clearly understood the emergency nature of the surgery, but failed to file a grievance even under the less rigid "emergency" procedure provided by the institution.  Indeed, it appears he took no steps to secure the surgery for the three month period he was out-of-custody and in Albuquerque following his release from DACDC.

An action filed before the exhaustion of administrative remedies is usually dismissed without prejudice to give the plaintiff an opportunity to comply with the requirement.  However, given that Plaintiff acknowledges that it is no longer possible for him to meet the dictates of 42 U.S.C. § 1997e(a), I see no reason to avoid dismissal of this action with prejudice.

Wherefore,

**IT IS HEREBY ORDERED** that Defendants' Motion to Dismiss for Failure to Exhaust Remedies Under the PLRA *(Doc. 20)* is **granted**.  A final order pursuant to FED. R. CIV. P. 58 shall be entered.

_____
UNITED STATES MAGISTRATE JUDGE